[Cite as *State v. Morris*, 2026-Ohio-2576.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
FAIRFIELD COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO | Case No. 2025 CA 00033 |
| Plaintiff - Appellee | Opinion and Judgment Entry |
| -vs- | Appeal from the Fairfield County Court of Common Pleas, Case No. 2021 CR 00500 |
| GARRICK S. MORRIS | Judgment: Affirmed |
| Defendant - Appellant | Date of Judgment Entry: July 2, 2026 |

**BEFORE:** William B. Hoffman; Robert G. Montgomery; Kevin W. Popham, Judges

**APPEARANCES:** R. Kyle Witt, Fairfield County Prosecuting Attorney, Steven Darnell, Austin Lines, Assistant Prosecuting Attorneys, for Plaintiff-Appellee; April F. Campbell, Campbell Law, LLC, for Defendant-Appellant.

*Hoffman, P.J.*

**{¶1}** Appellant Garrick Morris appeals the August 19, 2025, Judgment Entry entered by the Knox County Court of Common Pleas, denying his petition for post-conviction relief.

**{¶2}** Appellee is the State of Ohio.

STATEMENT OF THE CASE

{¶3} The relevant facts and procedural history are as follows:

{¶4} On December 8, 2021, the Fairfield County Grand Jury indicted Garrick Morris on two counts of Rape, in violation of R.C. §2907.02(A)(1)(b), both felonies of the first degree; and two counts of Gross Sexual Imposition alleging he had contact with K.T.M., not his spouse, when K.T.M. was less than thirteen years of age, in violation of R.C. §2907.05(A)(4), both felonies of the third-degree.

{¶5} The two counts of Rape were for digital penetration of the victim's vagina. The victim is K.T.M., his twelve-year old granddaughter.

{¶6} The first count of Gross Sexual Imposition alleged on October 12, 2021, to October 13, 2021, Appellant rubbed his genitals against the genitals of the victim while both were clothed. The remaining count of Gross Sexual Imposition alleged Appellant rubbed his hand against the genitals of the victim. This last count spanned a period of a couple of years as the conduct was alleged to have occurred frequently between October, 2019, and October, 2021.

{¶7} Following numerous continuances, a trial was held on March 5, 2024, wherein the jury heard testimony from the victim K.T.M., Officer Clark with the Pickerington Police Department, School Resources Officer Deputy Stephens, Madison Collier, a forensic interview with Harcum House and R.N. Rhonda Wells, also with Harcum House, who examined K.T.M. and noted her injuries.

{¶8} At trial the jury heard the following testimony:

{¶9} Officer Clark testified he is employed with the Pickerington Police Department. As part of his duties, he is a school resource officer who looks out for the safety and security of the students. He stated he spoke with the victim, K.T.M., on October

18, 2021, in the school guidance counselor's office. During their conversation, K.T.M. was visibly upset. K.T.M. told Officer Clark she had been sexually assaulted in her home in Fairfield County. K.T.M. told Officer Clark she would be more comfortable speaking with a female officer.

{¶10} Officer Clark stated he was present when A.M., K.T.M.'s grandmother, arrived at school. Officer Clark described A.M. as angry and aggressive toward K.T.M., not nurturing or sympathetic.

{¶11} Next, Deputy Tabitha Stephens testified she is a school resource officer employed by the Fairfield County Sheriff's Department. When Deputy Stephens arrived, she noted K.T.M. was visibly upset. She was trembling, her eyes were red, and she was crying. K.T.M. then described how the Appellant abused her. The Appellant placed K.T.M. in weird positions, put his hands on her private areas, and he put his finger inside her vagina, causing bleeding and stinging.

{¶12} Deputy Stephens described A.M.'s attitude as unsympathetic and unbelieving. Deputy Stephens transported K.T.M. to the child advocacy center because K.T.M. said she did not feel comfortable riding with A.M.

{¶13} The jury next heard from the victim, K.T.M., who testified she was born in 2008, she currently attends high school and is in the ninth grade. A.M. and the Appellant are her grandparents. She lived with them in Fairfield County, Ohio. Her cousins and siblings also lived with her grandparents. In October of 2021, she was twelve years old.

{¶14} K.T.M. continued her testimony, describing the Appellant's abuse. It started with inappropriate touching such as "wedgies." He gave them to all the kids in the house. The boys were given "wedgies" from behind and the girls from the front. He would do this in front of other people. It was very uncomfortable. She asked him to stop, but he did not.

Then he started laying her down on her back, rubbing the back of his hand on her privates before pulling up on the underwear from the inside. It progressed further to him rubbing his fingers on her vaginal area after he laid her down on her back. She started lying about having her period so he would refrain from the "wedgies." She reported the touching about a week after it happened.

{¶15} She testified she was in her room with her younger cousin, she was on the bed, and Appellant was rubbing his genitals on K.T.M. while he was giving her a "wedgie." She asked her younger cousin for help, but the cousin thought it was a big joke. Her younger cousin left the room, and the Appellant stuck his fingers in her vagina. She felt pain and realized she was bleeding. She began crying and told him to stop. The Appellant called her a crybaby and told her to "shut up."

{¶16} K.T.M. described a second incident which occurred about a month prior. Again, the Appellant was rubbing his hand on her genitals. No one else was around. She closed her eyes and felt a significant amount of pain and felt like something was inside her vagina.

{¶17} K.T.M. then reached out to her aunt and her mother, who advised her she should report this to the authorities. (T. at 347-350). K.T.M. stated no one put her up to this or told her what to say other than to tell the truth. (T. at 349). K.T.M. testified she made a disclosure to her guidance counselor at school and then subsequently to the forensic interviewer at Harcum House. (T. at 350, 354). K.T.M. explained she did not tell her grandmother A.M. because she did not think she would believe her. (T. at 351). K.T.M. testified she willingly submitted to the forensic interview and the physical exam and again stated nothing else would have caused an injury to her vagina. (T. at 354-355).

{¶18} K.T.M. then described the immediate and swift negative consequences she faced from her other family members for reporting this. (T. at 355-356). She testified her grandmother A.M. was upset even on the car ride home and the other kids at home immediately began screaming at her while her grandmother watched. (T. at 355-356). She said they called her names and even told her to kill herself. (T. at 356). She stated she was shut out and threatened by everyone in the house. Id. Her grandmother A.M. did not give her any support. Id. Rather, A.M. told her it was her fault, she was ruining the family, and she was going to have to go back to foster care. (T. at 357). Children Services finally intervened and placed K.T.M. with an aunt. However, this aunt was close to A.M. and K.T.M. continued to be punished there. (T. at 358). K.T.M. was informed she was going to be excluded from family gatherings, including being left alone on Thanksgiving, being told she wasn't trusted by the family. (T. at 358-359).

{¶19} K.T.M. testified "because the pain that they were causing me was way worse than what actually happened," she decided life would be easier if she took back or recanted what had happened. (T. at 366). Her grandmother A.M. then took her to see her grandfather's trial defense attorney. (T. at 361). K.T.M. stated she later became aware her grandmother A.M. had secretly recorded a call between her and her aunt, which occurred after the visit to the defense attorney. (T. at 362). This recording was played in court. (T. at 363). During that call, K.T.M. made numerous statements indicating it was a misunderstanding, and the abuse must not have happened. (T. at 363-364). K.T.M. also told her aunt she should not have listened to her mother, who had told her to report what she had said had happened. (T. at 364-365). During that recorded call, K.T.M. stated she must have been confused and might have been wrong, and that it was her fault, but she wanted her family back. (T. at 365).

**{¶20}** In November of 2023, K.T.M. visited her friend's house. She left her phone unattended. When she woke up the following day, her social media accounts were all deleted, her emails were gone, and her text messages were deleted except for a couple from her grandmother A.M. Later, K.T.M. discovered a message was sent from her phone saying, "I'm sorry, I made everything up." K.T.M. told officers her friend, S.W., may have sent it. (T. at 367). She testified she did not send any message to A.M. Id. She explained she became aware of the messages because A.M. sent her texts later that morning. (T. at 369). K.T.M. testified she took screenshots of those text messages and forwarded those to her mother, with the expectation they would be reported to the authorities because A.M. had been ordered to have no contact with her. (T. at 370). It was later stipulated that A.M. had received a text message on November 6, 2023, at 4:02 a.m. that purported to be from K.T.M.'s cell phone. (T. at 635-637). That stipulation also indicated there was no forensic evidence on the victim's phone or any other phone which could definitively show who had sent that message. Id. The stipulation, as well as a photocopy of the text message which contained statements equivalent to a recantation, was submitted to the jury. Id. K.T.M. testified during this time other people had access to her phone. (T. at 367). One of those people was S. W., an ex-boyfriend of hers. Id.

**{¶21}** Cody Tatum then testified he is the executive director at the Harcum House, a local child advocacy center. The advocacy center performs forensic interviews of child abuse victims, forensic medical examinations, provides therapy, and assists caregivers with food security issues.

**{¶22}** Next, Madison Collier testified she is employed as a forensic interviewer at Harcum House. She interviewed K.T.M. on October 18, 2021. K.T.M. disclosed multiple incidents of sexual abuse by the Appellant during the interview.

{¶23} Rhonda Wells then testified she is a registered nurse with the Harcum House. She is the Patient and Team Services Manager. Her functions are to supervise the child/family specialists, and she is a pediatric and adolescent sexual assault nurse examiner. She examined K.T.M. and noted two injuries. She observed a torn hymen and an abrasion on the posterior of the torn hymen. Nurse Wells testified these injuries were consistent with the victim's history of digital penetration of her vagina. She testified this was definitely a penetrative injury to the victim's vagina. She noted the tear in the hymen would have been painful and caused bleeding. She noted no bike riding, falling, or "wedgie" could have caused this injury.

{¶24} The State then rested its case.

{¶25} Appellant testified in his own defense. He admitted he gave "wedgies" to K.T.M. even though she asked him to stop. He did not respect her boundaries about touching, even though it drove her to tears. He denied committing the offenses or knowing what could have caused the injuries to K.T.M.

{¶26} On March 8, 2024, the jury found Appellant guilty as charged.

{¶27} By Judgment Entry filed March 25, 2024, the trial court sentenced Appellant to Life with the first possibility of parole after ten (10) years on both Counts One and Two, twenty-four (24) months on Count Three and twelve (12) months on Count Four. The trial court further ordered Counts One and Two be served concurrently to each other but consecutively to Counts Three and Four, with the first possibility of parole after thirteen (13) years.

{¶28} On direct appeal, this Court upheld Appellant's convictions. See *State v. Garrick Morris*, 2025-Ohio-1039 (5th Dist.).

{¶29} On May 8, 2025, Appellant filed a Notice of Appeal with the Ohio Supreme Court.

{¶30} On June 30, 2025, Appellant filed a Petition for Post-Conviction Relief with the Fairfield County Court of Common Pleas.

{¶31} On July 21, 2025, the State filed an Answer and Motion to Dismiss.

{¶32} On July 29, 2025, Morris filed a Motion to Amend his Petition.

{¶33} On August 7, 2025, the Ohio Supreme Court declined to accept jurisdiction of his appeal.

{¶34} By Judgment Entry filed August 19, 2025, the trial court granted Appellant's motion to amend and denied the Petition.

{¶35} It is from the August 19, 2025 Judgment Entry Appellant now appeals, raising the following assignments of error for review:

ASSIGNMENTS OF ERROR

I. MORRIS WAS ENTITLED TO A HEARING ON HIS POST-CONVICTION RELIEF CLAIM, AND HIS PETITION SHOULD HAVE BEEN GRANTED.

II. MORRIS'S ATTORNEY'S DELAYED DISCLOSURE OF K.M.'S DIARY, WHICH PRECLUDED ITS USE AT TRIAL, WAS NOT BARRED BY RES JUDICATA.

## I., II.

**{¶36}** Because they are interrelated, we will address Appellant's first and second assignments of error together.

**{¶37}** A petition for post-conviction relief is intended as a means to reach constitutional issues that would otherwise be impossible to reach because the evidence supporting those issues is not contained in the record of the petitioner's criminal conviction. *State v. Smith*, 2017-Ohio-2616, ¶ 13. A petition for post-conviction relief is a civil collateral attack on a criminal judgment, not an appeal of that judgment. *State v. Calhoun*, 1999-Ohio-102. A petition for post-conviction relief does not, therefore, provide a petitioner with a second opportunity to litigate his conviction, nor is the petitioner automatically entitled to an evidentiary hearing on the petition. *State v. Jackson*, 64 Ohio St.2d 107, 110 (1980), *State v. Lewis*, 2008-Ohio-3113, ¶ 8 (5th Dist.)

**{¶38}** Here, Appellant's petition alleged ineffective assistance of counsel. Before a petitioner can be granted a hearing in proceedings for post-conviction relief upon a claim of ineffective assistance of counsel, petitioner bears the initial burden to submit evidentiary quality material containing sufficient operative facts that demonstrate a substantial violation of any of trial counsel's essential duties in addition to prejudice arising from that ineffectiveness. *State v. Church*, 2018-Ohio-368 (5th Dist.), citing *State v. Calhoun*, 1999- Ohio-102. Further, the Supreme Court of Ohio has held the proper basis for dismissing a petition for post-conviction relief without holding an evidentiary hearing includes the failure of the petitioner to set forth specific operative facts to establish substantive grounds for relief. *State v. Lentz*, 1994- Ohio-532.

**{¶39}** "Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment." *State v. Perry*, 10 Ohio St.2d 175 (1967), paragraph nine of the syllabus. A petition for postconviction relief may defeat the res judicata bar only if its claims are based on evidence de hors the record. *State v. McNeill*, 137 Ohio App.3d 34 (9th Dist. 2000) citing *State v. Cole*, 2 Ohio St.3d 112 (1982).

**{¶40}** A trial court's decision to grant or deny a post-conviction petition filed pursuant to R.C. §2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for post-conviction relief if it is supported by competent and credible evidence. *State v. Gondor*, 2006-Ohio-6679, ¶ 58. A trial court's decision to deny a petition for postconviction relief without holding an evidentiary hearing is left to the sound discretion of the trial court. *State v. Lichtenwalter*, 2021-Ohio-1394 (5th Dist.). "Abuse of discretion" connotes more than a mere error of law or judgment, instead requiring a finding the trial court's decision was unreasonable, arbitrary, or unconscionable. *Darby v. A-Best Prod. Co.*, 2004-Ohio-3720, ¶ 13. Most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. *AAAA Ent., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161 (1990). An unreasonable decision is one backed by no sound reasoning process which would support that decision. *Id.* "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶41} Before granting an evidentiary hearing, the trial court must determine whether substantive grounds for relief exist. R.C. §2953.21(D). In making such a determination, the court shall consider the petition, supporting affidavits, documentary evidence, and all the files and records from the case. *Calhoun* at 284. The burden on the Petitioner is high as the trial court has already "been presented with evidence sufficient to support the original entry of conviction." Id.

{¶42} "Substantive grounds for relief exist and a hearing is warranted if the petitioner produces sufficient credible evidence that demonstrates the petitioner suffered a violation of the petitioner's constitutional rights." *In re B.C.S.*, 2008-Ohio-5771, ¶ 11 (4th Dist.). The petitioner must demonstrate the claimed "errors resulted in prejudice." *Calhoun* at 283.

{¶43} In his petition, and in his appellate brief, Appellant claimed there were seven witnesses that if called, and if believed, would have contradicted K.T.M.'s testimony and corroborated his own testimony. These witnesses included three of Appellant's other grandchildren, Appellant's two daughters, Appellant's wife (the victim's grandmother), and Appellant's aunt.

{¶44} The trial court found Appellant failed to meet his burden because the Petition merely sets forth additional, cumulative evidence the jury may have considered. Appellant failed to establish said evidence would have been admitted or would have led to a different finding by the jury.

{¶45} In its Entry, the trial court set forth two grounds upon which it based its denial of Appellant's petition. First, the trial court found "the affidavits do not set forth any operative facts entitling the Petitioner to a hearing or relief." (JE at 4). The court further found the Petitioner had not shown "by clear and convincing evidence that …

[these] witnesses at trial could have produced a not guilty verdict. His statements to that effect in his brief and supporting papers are speculative and conclusory." Id. The court found none of the witnesses had any direct knowledge of the alleged crimes nor would they have provided any direct, factual evidence in support of Petitioner's claim he did not commit the crimes of rape and/or gross sexual imposition. Rather, said witnesses would only have testified to Petitioner's good character or attacked the victim's credibility. The same holds true for additional evidence of recantation by the victim. The jury heard testimony as to numerous recantations by the victim and heard from the victim herself concerning those recantations. Any further testimony or evidence concerning the victim's recantations would have only been cumulative and did not amount to substantive grounds for relief.

{¶46} Appellant likewise claims the victim's diary also contained recantations of the sexual abuse and should have been presented to the jury.

{¶47} At trial, the diary was only mentioned once - during opening statement by the prosecution. The State had filed a Motion in Limine to prevent the use of the diary at trial, but the trial court never ruled on the motion. Therefore, there was nothing in the record which prevented the reference to or use of the diary by defense counsel. However, we again find the use of the diary to show recantation by the victim would again have only been cumulative and did not amount to substantive grounds for relief.

{¶48} Appellant also claims his trial counsel was ineffective in not calling the above referenced witnesses and in delaying the disclosure of the diary and thereby precluding its use at trial. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that

counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraphs two and three of the syllabus. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶49} Because there are countless ways to provide effective assistance in any given case, judicial scrutiny of a lawyer's performance must be highly deferential. *Strickland*, at 694. "Decisions on strategy and trial tactics are granted wide latitude of professional judgment, and it is not the duty of a reviewing court to analyze trial counsel's legal tactics and maneuvers." *State v. Quinones*, 2014-Ohio-5544, ¶ 18 (8th Dist.).

{¶50} As set forth above, we find the use of the additional witnesses and any recantations which may have been contained in the victim's diary would only have provided the jury with similar, cumulative evidence. The victim herself testified and explained why she recanted her initial accusations, and the jury clearly chose to believe her.

{¶51} Appellant claims trial counsel had the diary well in advance of trial and it was his delayed disclosure which prevented the diary's use at trial. While we find no documentary support for said claim, even assuming same to be true, we find no prejudice to Appellant as any recantations contained in the diary would not amount to new information which had not already been presented to the jury.

{¶52} We likewise find no merit in Appellant's argument "prior false sexual allegations" made by the victim should have been presented to the jury. (Pet. Brief at 7). This alleged statement was made in an in-camera interview during an adoption

proceeding when the victim was nine years old wherein, she merely repeated what she was told by an adult. This bears no relevance to the case at hand.

{¶53} Upon review, we find Appellant has not demonstrated how any of the affidavits, exhibits and/or claims are new, admissible, relevant evidence which should have been considered by the jury.

{¶54} Based on the foregoing, we find the trial court did not abuse its discretion in denying Appellant's request for an evidentiary hearing or in denying his petition for post-conviction relief. Appellant's assignments of error are overruled.

{¶55} The judgment of the Fairfield County Court of Common Pleas is affirmed.

{¶56} Costs to Appellant.


By: Hoffman, P.J.

Montgomery, J. and

Popham, J. concur.